Drevet Hunt (Bar No. 240487)
dhunt@cacoastkeeper.org
CALIFORNIA COASTKEEPER
1100 11th Street, 3rd Floor
Sacramento, California 95814
Phone: (415) 606-0864
Fax: (415) 520-6125

Attorney for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>PRIME PLATING AEROSPACE, INC., a Nevada corporation doing business as PRIME PLATING, and SCHMIDT INDUSTRIES, INC., a California corporation doing business as PRIME PLATING,<br><br>Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)** |

LOS ANGELES WATERKEEPER ("Waterkeeper") ("Plaintiff"), by and through its counsel of record, herby alleges as follows:

## I. JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2202 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On September 8, 2020, Waterkeeper issued a 60-day notice letter ("Notice Letter") to Prime Plating Aerospace, Inc. and Schmidt Industries, Inc. (collectively "Defendants"). The Notice Letter informed Defendants of their violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122-DWQ (hereinafter referred to as the "Storm Water Permit"), and the Clean Water Act at Defendants' facility located at 11321 Goss St., Sun Valley, California 91352 ("Facility"). The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

3.     The Notice Letter was sent to Defendants as required by 40 C.F.R. § 135.2(a)(1) (2020). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Los Angeles Regional Water Quality Control Board ("Regional Board") as required by Section 505(b) of

the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as Exhibit A and is fully incorporated herein by reference.

4.      More than sixty (60) days have passed since the Notice Letter was served on the Defendants and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.   INTRODUCTION

6.      With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations such as the Facility pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic-dependent wildlife. These surface waters are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. As the Clean Water Act requires, these contaminated discharges can and must be controlled for the ecosystem to regain its health. Polluted discharges from plating facilities such as the Facility contain pH-affecting substances; metals, such as iron, aluminum, lead, zinc, cadmium, chromium, nickel, copper, arsenic, titanium, and mercury; chemical oxygen demand ("COD"); biological oxygen demand ("BOD");

total suspended solids ("TSS"); Nitrate plus Nitrite ("N+N"); benzene; gasoline and diesel fuels; fuel additives; coolants; antifreeze; total kjeldahl nitrogen ("TKN"); trash; oil and grease ("O&G"); and per- and polyfluoroalkyl substances ("PFAS"). Discharges of polluted storm water to the Los Angeles River and its tributaries and outfalls pose carcinogenic and reproductive toxicity threats to the public and adversely affect the surface waters.

7. This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendants' operations at the Facility.

8. Plaintiff specifically alleges the violations regarding Defendants' discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

III. PARTIES

A. The Plaintiff

9. Los Angeles Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of California. Founded in 1993, Waterkeeper's members ("Members") live and/or recreate in and around the Los Angeles area. Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Los Angeles' watersheds. To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members. Members of Waterkeeper own homes and reside in Los Angeles County and use and enjoy the tributaries flowing into the Los Angeles River, the Los Angeles River, and the bordering

parks, pathways, golf, courses and athletic fields, and further downstream bays and beaches of the Pacific Ocean. As explained in detail below, Defendants discharge pollutants into the Tujunga Wash, the Los Angeles River, and the Pacific Ocean ("Receiving Waters") in violation of the Clean Water Act and the Storm Water Permit. Defendants, in fact, identify the Ocean as the "receiving water" of storm water discharges in its most recent Notice of Intent to apply for a General Permit to Discharge Storm Water Associated with Industrial Activity, dated July 21, 2015. Members of Waterkeeper also use and enjoy the Receiving Waters to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, and run.

10.    Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and the natural resources of waters in the Los Angeles Area. As referenced herein, Waterkeeper Members use the and enjoy the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs Waterkeeper Members' use and enjoyment of these waters. The unlawful discharge of pollutants from the Facility has required Waterkeeper to expend its limited resources to study and combat pollution from the Facility. Thus, the interests of Waterkeeper and its Members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the Storm Water Permit.

11.    Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendants' discharge of polluted storm water and non-storm water from the Facility, negatively impacts and impairs Waterkeeper's Members' use and enjoyment of the Receiving Waters.

12.    Continuing commission of the acts and omissions alleged herein will irreparably harm Waterkeeper's Members, for which they have no plain, speedy, or adequate remedy at law.

**B. The Defendants**

13.    Plaintiff is informed and believes, and thereon alleges, that Prime Plating Aerospace, Inc. is the owner and operator of the Facility located at 11321 Goss St., Sun Valley, CA 91352.

14.    Plaintiff is informed and believes, and thereon alleges, that Prime Plating Aerospace, Inc. is doing business as Prime Plating at 11321 Goss St., Sun Valley, CA 91352.

15.    Plaintiff is informed and believes, and thereon alleges, that Prime Plating Aerospace, Inc. is a Nevada Corporation doing business in California and registered with the California Secretary of State as entity number C3365456.

16.    Plaintiff is informed and believes, and thereon alleges, that Schmidt Industries, Inc. is the owner and operator of the Facility located at 11321 Goss St., Sun Valley, CA 91352.

17.    Plaintiff is informed and believes, and thereon alleges, Schmidt Industries, Inc. is doing business as Prime Plating at 11321 Goss St., Sun Valley, CA 91352.

18.    Plaintiff is informed and believes, and thereon alleges, that Schmidt Industries, Inc. is a California Corporation and registered with the California Secretary of State as entity number C2811822.

**IV.    STATUTORY BACKGROUND**

**A. The Clean Water Act**

19.    Section 301(a) of the CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

20.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single statewide general permit applicable to all industrial storm water discharges. 33 U.S.C. § 1342.

21.     Section 301(b) of the CWA requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants, and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. §§ 125.3(a)(2)(ii)–(iii) (2020).

22.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

23.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1) (2020).

24.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2 (2020).

25.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand,

cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2 (2020).

26.     The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2 (2020).

27.     "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

28.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

29.     The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." 40 C.F.R. § 122.2 (2020). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

30.     The CWA confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006).

31.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Id.* at 779.

32.   A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Id.* at 782.

33.   Sections 505(a)(1) and 505(f) of the CWA provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

34.   The Defendants, each of them, is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

35.   An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

36.   Pursuant to sections 309(d) and 505 of the CWA, each separate violation of the CWA occurring before November 2, 2015, subjects the violator to a penalty of up to $37,500 per day; violations occurring after November 2, 2015, and assessed on or after January 15, 2018, subject the violator to a penalty of up to $53,484 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation) (2020).

37.   Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

## B. California's Storm Water Permit

38.   Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to

dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *Id.*

39.     The Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits.

40.     In California, the State Board and Regional Water Quality Control Boards are charged with regulating pollutants to protect California's water resources.

41.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R. § 123.25 (2020).

42.     Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

43.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

44.     On July 1, 2015, the operative Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). Storm Water Permit, Section I(A) (Finding 4).

45.     On November 6, 2018, the State Board issued an amended Order No. 2015-0122-DWQ, incorporating (1) Federal Sufficiently Sensitive Test Method Ruling, (2) TMDL Implementation Requirements, and (3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Amendment").

46.     In order to lawfully discharge storm water in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. Storm Water

Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Section II(B).

### C. The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

47.     The Storm Water Permit contains certain absolute prohibitions. Storm Water Permit, Section III(A). The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Section III(B).

48.     Section III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

49.     Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants in discharges through implementation of Best Management Practices ("BMPs") that constitute BAT for toxic or non-conventional pollutants and BCT for conventional pollutants. Storm Water Permit, Section V(A); *see also* 33 U.S.C. § 1311(b).

50.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

51.     The EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015);

Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

52.     The EPA established Parameter Benchmark Values for the following parameters, among many others: TSS, 100 mg/L; O&G, 15 mg/L; total organic carbon ("TOC"), 110 mg/L; aluminum ("Al"), 0.75 mg/L; iron ("Fe"), 1 mg/L; copper ("Cu"), 0.0123 mg/L; zinc ("Zn"), 0.11 mg/L; pH, 6–9 standard units ("s.u."); nitrate & nitrite nitrogen ("N+N"), 0.68 mg/L. The Storm Water Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values. Storm Water Permit, Section I(M) (Finding 62).

53.     Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment. Further, discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit. Storm Water Permit, Section VI(B).

54.     Section VI(A) of the Storm Water Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

55.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA, to be protective of the beneficial uses of the waters that receive polluted discharges.

56.     The Regional Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region Basin ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental

physiological responses in, human, plant, animal, or aquatic life." Basin Plan, 3-40 (2019). The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-8. The Basin Plan decrees that waters shall not contain chemical constituents, coloration, substances, or floating material in concentrations that cause nuisance or adversely affect beneficial uses. Basin Plan, Ch. 3 at 29-30, 32-33, 44-45, 50. The Basin Plan requires a pH range of 6.5–8.5 s.u. for all inland surface waters, bays and estuaries, and requires that ambient pH levels shall not be changed from their natural condition by more than 0.5 s.u. for inland surface waters, and by more than 0.2 s.u. for bays and estuaries, as a result of waste discharge. Basin Plan, 3-40.

57.    In addition to the *de facto* beneficial uses of swimming and fishing applicable to the Receiving Waters herein, *see* 40 C.F.R. § 131.10(a) and (g), the Basin Plan also identifies present and potential beneficial uses for various hydrologic units in the Los Angeles Region, including municipal and domestic supply, agricultural supply, industrial process supply, industrial service supply, groundwater recharge, fresh water replenishment, navigation, hydropower generation, water contact recreation, limited water contact recreation, non-contact water recreation, high flow suspension, commercial and sport fishing, aquaculture, warm fresh water habitat, cold fresh water habitat, inland saline water habitat, estuarine habitat, wetland habitat, marine habitat, wildlife habitat, preservation of biological habitats of special significance, rare, threatened or endangered species migration of aquatic organisms, spawning, reproduction and/or early development, and shellfish harvesting. Basin Plan, Ch. 2 at 4-8.

58.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan—including the Los Angeles River Basin—or deemed on a case-by-case basis, would be designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

59.     According to the 2016 303(d) List of Impaired Water Bodies, Reach 3 of the Los Angeles River downstream of the Facility is listed as impaired for Trash, Ammonia, Copper, Nutrients (Algae), Toxicity, and Fecal Indicator Bacteria. Tujunga Wash is listed as impaired for Ammonia, Copper, Fecal Indicator Bacteria, and Trash.

60.     The Receiving Waters for pollution from the Facility are impaired, and thus the Defendants' illegal discharges of pollutants above the WQS contribute to the continued impairment of the beneficial uses in the watershed.

61.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

62.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000).

63.     Discharges with pollutant levels in excess of the CTR criteria,[1] the Basin Plan, and/or other applicable WQS are violations of Section VI(A) of the Storm Water Permit.

### D. The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements

64.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm

---

[1] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

65.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

66.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

67.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section XV.

68.     The Storm Water Permit also requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Sections X(A)(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. Storm Water Permit, Section X(A)(9)(d).) The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

69.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application Report Tracking System ("SMARTS"), within 30 days. Storm Water Permit, Section X(B)(2).) Dischargers are required to submit

revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. Storm Water Permit, Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).

**E. The Storm Water Permit's Monitoring and Reporting Requirements**

70.    The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit, Section X(I). The required monitoring and reporting and MIP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit, Sections I(K) (Finding 69) and XI. The required monitoring and reporting and MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. Storm Water Permit, Sections I(K) (Finding 70) and XI.

71.    The objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

72.    The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Storm Water Permit, Section XI.

73.    The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55-56) and XI.

74.    Section XI(A)(4) of the Storm Water Permit requires that the MIP be revised as necessary to ensure compliance with the Storm Water Permit.

75.     Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

76.     Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. (Storm Water Permit, Section X(B)(1).)

77.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

78.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

79.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). Dischargers are required to submit the storm water sample analyses to the State Board and Regional Board.

80.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional

applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

81.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with and has addressed all applicable requirements of the Storm Water Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

82.     Section XII(C) of the Storm Water Permit requires a discharger to execute a Level 1 Exceedance Response Action ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the Storm Water Permit, or a execute a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL for two consecutive reporting years, for any required sampling and analysis parameter under the Storm Water Permit. The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances and comply with the Storm Water Permit. Based upon the ERA Evaluation(s), the discharger shall as soon as practicable, but not later than January 1, submit an ERA Report and certify that the ERA Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA report requirements are more stringent than those for a Level 1 ERA report.

## V.     STATEMENT OF FACTS

### A. The Facility Site Description

83.     The Defendants operate an industrial facility located at 11321 Goss St., Sun Valley, CA 91352, which encompasses 52,400 square feet. The Facility's

general purpose is plating, anodizing, and coating. The Facility operates Monday through Friday, 6:00 AM to 4:30 PM.

84.    The Facility's NOI states that Defendants operate the Facility under Standard Industrial Classification ("SIC") Code 3471, covering establishments engaged in electroplating, plating, polishing, anodizing, and coloring. The Facility's annually submitted SWPPPs also identify the North American Industry Classification System ("NAICS") code 332813 (also covering plating, polishing, anodizing, and coloring).

85.    Under this SIC code, the General Permit requires Defendants to analyze storm water samples for particular parameters, including TSS, pH, oil and grease, zinc, N+N, iron, and aluminum.

86.    Facilities must sample and analyze for additional parameters identified on a facility-specific basis to reflect a facility's pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI(B)(6).

87.    Under the State Board Order WQ 2019-0045-DWQ ("Water Code Sections 13267 and 13383 Order for the Determination of the Presence of Per- and Polyfluoroalkyl Substances at Chrome Plating Facilities"), facilities in California that perform chrome plating and have potential to dispose, discharge, spill, or release fume suppressants or other substances potentially containing PFAS to land, drains, sewers, surface water, air, and/or groundwater are required to develop a Work Plan and follow up with an Investigation and Final Report on their findings. Alternatively, facilities that do not perform chrome plating or use fume suppressants were given the option to submit a Questionnaire indicating that they do not pose a threat of PFAS contamination.

88.    Plaintiff is informed and believes, and thereon alleges, that the areas of industrial activity at the Facility include, involve, and take place in or around

aluminum, nickel, zinc, waste treatment and EN & phosphate departments, an aerospace process room, nickel strip, chemical storage, holding and general storage tanks, F006 super sacks, recycling and maintenance areas, and a masking room and laboratory. The industrial activities at the Facility produce pollutants including, but not limited to, pH-affecting substances; metals such as iron, aluminum, lead, zinc, cadmium, chromium, copper, nickel, argon, titanium, and mercury; TSS; N+N; trash; cyanide; ammonia; O&G; and PFAS.

89.    Plaintiff is informed and believes, and thereon alleges, that metals, paper waste, and other materials are stored outside at the Facility, that tanks and chemical containers are not stored with secondary containment, and that activities occur within the interior and exterior areas of the Facility without adequate cover or containment, resulting in discharges of polluted storm water.

90.    Plaintiff is informed and believes, and thereon alleges, that the Facility has failed and continues to fail to prevent or limit significant quantities of trash from being dispersed daily to areas outside the site. When it rains, this refuse is washed into the County of Los Angeles municipal separate storm sewer system ("MS4") and flows ultimately into the Receiving Waters.

91.    Plaintiff is informed and believes, and thereon alleges, that storm water from the Facility flows off the paved areas on the Facility towards Goss Street at one or more discrete points on Goss Street. Storm water from the Facility then flows to the MS4 through a storm drain inlet which discharges to a tributary of the Los Angeles River and into the River. Plaintiff is also informed and believes, and thereon alleges, that fugitive storm water discharges from the Facility from borders throughout the site and also enters the MS4 system.

92.    Plaintiff is informed and believes, and thereon alleges, that storm water flowing from the Facility flows to the MS4 and discharges into the Tujunga Wash, a tributary to the Los Angeles River, which flows to the Pacific Ocean. The

Los Angeles River, its tributaries, and the Pacific Ocean are waters of the United States.

93.     Plaintiff is informed and believes, and thereon alleges, that each of the industrial activities, industrial areas, and industrial materials referenced herein impact and potentially impact storm water and non-storm water runoff and discharges at the Facility.

## B. The Los Angeles River

94.     The Los Angeles River runs through one of the largest watersheds in the Los Angeles Region, draining over 800 square miles. The reach of the river pertinent for this action is located within Los Angeles County. Preservation of natural riparian habitat, and scenic values of the County's streams, creeks, and lakes carry significant importance for the inhabitants of the area.

95.     Los Angeles County also contains critical habitat for southern California coast plants (including the Thread-leaved Brodiaea, the Lyon's Pentachaeta, and the Braunton's Milk-Vetch) and endangered animals such as the Western Snowy Plover, the Southwestern Willow Flycatcher, and the Coastal California Gnatcatcher, among other flora and fauna.

96.     Pollutants from industrial activities, among other threats, can destroy or degrade aquatic habitat essential for breeding and rearing for the species known to inhabit Los Angeles County and that depend on surface water, including but not limited to the Santa Ana Sucker, the Tidewater Goby, the Unarmored Threespine Stickleback, and the Steelhead.

## C. Storm Water Discharges from the Facility

97.     According to the Facility's 2020–2021 Annual Report, there is at least one (1) drainage area that discharges storm water from the Facility.

98.     Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to properly identify all discharge locations from the Facility as required by the Storm Water Permit.

99.    The Facility discharges into the Tujunga Wash, the Los Angeles
River, and ultimately the Pacific Ocean. The Los Angeles River, its tributaries, and
the Pacific Ocean are waters of the United States within the meaning of the CWA.

### D. The Facility's Storm Water Permit Coverage

100.    The Facility's NOI lists the Receiving Water as the Pacific Ocean.

101.    SMARTS lists the current Facility Waste Discharge Identification
("WDID") number for the Facility as 4 19I021814. SMARTS lists the Facility
coverage under the Storm Water Permit as "Active."

### E. Defendants' Storm Water Discharges Contain Elevated Levels of Pollutants

102.    Storm water samples collected by Plaintiff on November 27, 2019, at
the Facility contained concentrations of pollutants far in exceedance of applicable
NALs and EPA Benchmarks for pollutants including, but not limited to, TSS, Zn,
Fe, Al, Cu, Ni, Cd, and N+N.

103.    Plaintiff is informed and believes, and thereon alleges, that had the
Defendants collected sufficient storm water samples each reporting year for
analysis, additional instantaneous NAL exceedances would have been found.

104.    Samples of storm water discharges collected at the Facility contain
pollutants in excess of levels known to adversely impact aquatic species and the
environment, as well as in excess of levels authorized by the Storm Water Permit's
Effluent Limitations and Receiving Water Limitations, the Benchmarks, CTR
criteria and other applicable WQS.

105.    Plaintiff is informed and believes, and thereon alleges, that during
and/or after every significant rain event—a rain event that produces stormwater
runoff, which according to the EPA occurs with more than 0.1 inches of
precipitation—or any other storm water or non-storm water discharge that has
occurred at the Facility since at least August 20, 2016, through the present,
Defendants have discharged and continues to discharge storm water from the

Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Benchmarks, CTR criteria, and other applicable WQS.

### F. Defendants' Failure to Comply with the Storm Water Permit's SWPPP Requirements

106.    Plaintiff obtained a SWPPP for the Facility dated November 6, 2020 ("2020 SWPPP"), from SMARTS. Plaintiff also obtained a SWPPP dated July 11, 2016, from SMARTS ("2016 SWPPP").

107.    Plaintiff is informed and believes that the 2016 SWPPP was the operative SWPP for the Facility prior to November 6, 2020.

108.    Plaintiff is informed and believes that the 2020 SWPPP is the operative SWPPP for the Facility since November 6, 2020.

109.    Plaintiff is informed and believes, and thereon alleges, that the 2020 SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities.

110.    Plaintiff is informed and believes, and thereon alleges, that the 2016 SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities.

111.    Plaintiff is informed and believes, and thereon alleges, that without properly identifying all industrial activities or all significant materials at the Facility in either the 2020 SWPPP or the 2016 SWPPP, the Defendants have not developed and/or implemented all appropriate BMPs.

112.    Plaintiff is informed and believes, and thereon alleges, that the 2020 SWPPP fails to identify, and the Defendants have failed to implement, the minimum BMPs required by the Storm Water Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; employee training and quality assurance; and record keeping.

113.   Plaintiff is informed and believes, and thereon alleges, that the 2016 SWPPP fails to identify, and the Defendants have failed to implement, the minimum BMPs required by the Storm Water Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; employee training and quality assurance; and record keeping.

114.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations.

115.   Plaintiff is informed and believes, and thereon alleges, that the significant exceedances of Benchmark Levels demonstrate that the Defendants have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

116.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed and continues to fail to evaluate the effectiveness of the Facility BMPs and adequately revise the Facility's SWPPP, despite significant concentrations of pollutants in the Facility's storm water discharges. Further, Defendants have failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

117.   Plaintiff is informed and believes, and thereon alleges, that the Defendants' failure to properly address pollutant sources and pollutants themselves results in the exposure of pollutants associated with industrial activities to precipitation.

118.   Plaintiff is informed and believes, and thereon alleges, that the Defendants' failure to properly address these pollutants and the pollutant sources results in the exposure of pollutants to precipitation, which carries these pollutants into the Receiving Waters.

### G. Defendants' Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements

119.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to develop an adequate MIP for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

120.   Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to, TSS, pH, O&G, Zn, N+N, Fe, and Al, and despite being required by SIC code to sample and analyze for each of those pollutants, Defendants do not sample for any of those pollutants as required under Section XI(B) and Table 1 of the Storm Water Permit.

121.   Plaintiff is informed and believes, and thereon alleges, that the Defendants are not members of the Metal Finishing Association of Southern California, an Approved Compliance Group, and thus the Defendants must comply with the monitoring provisions set forth in Section XI(B) of the Storm Water Permit.

122.   No storm water sampling results are publicly available for the Facility, as the Defendants have not taken any samples and have not uploaded any sampling information to SMARTS since enrolling in the Storm Water Permit, in violation of Section XI(B)(11) of the Storm Water Permit.

123.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to collect any storm water samples for analyses since at least August 20, 2016.

124.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed to sample storm water discharge from the Facility since at

least August 20, 2016 despite ample storm events in every reporting year from that date to the present.

125.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to report storm water samples as required under the Storm Water Permit since it enrolled in the Storm Water Permit.

126.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to revise the MIP for the Facility as necessary to ensure compliance with Section XI of the Storm Water Permit.

127.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to collect or analyze any storm water samples at the Facility.

128.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to sample storm water discharges from all discharge locations at the Facility.

129.   Plaintiff is informed and believes, and thereon alleges, that the Defendants consistently fail to perform, and/or have performed on their behalf, visual observations of storm water discharge locations during QSEs.

130.   Plaintiff is informed and believes, and thereon alleges, that the Defendants consistently failed, and continue to fail, to collect storm water samples during QSEs.

131.   Plaintiff is informed and believes, and thereon alleges, that in the event Defendants are a member of the Metal Finishing Association of Southern California compliance group, Defendants have failed and continue to fail to comply with the monitoring and reporting requirements of compliance group members, including by failing to collect and analyze samples, perform visual observations of discharge locations, and failed to submit reports as required by Section XI and XIV of the Storm Water Permit.

132.   Plaintiff is informed and believes, and thereon alleges, that Defendants have consistently failed, and continue to fail, to conduct one annual evaluation during the reporting year in accordance with Section XV of the Storm Water Permit.

130.   Plaintiff is informed and believes, and thereon alleges, that Defendants have consistently failed, and continue to fail, to submit Ad Hoc Reports in accordance with Section XI(B)(11) of the Storm Water Permit.

133.   Plaintiff is informed and believes, and thereon alleges, that Defendants have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including by failing to provide (1) a description of the noncompliance and its cause, (2) the period of noncompliance, (3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to reduce and prevent recurrence of the noncompliance.

134.   Plaintiff is informed and believes, and thereon alleges, that Defendants have consistently submitted and certified false Annual Reports, including, but not limited to, by indicating that storm water samples have been taken for during the previous reporting period when in fact no such samples were taken.

135.   Plaintiff is informed and believes, and thereon alleges, that Defendants should have entered, and must immediately now enter, the State Board's Exceedance Response Action ("ERA") program requiring reporting to the Regional Board regarding pollutant assessments. *See* Storm Water Permit, Section XII. Had Defendants taken storm water samples in compliance with the Storm Water Permit, the results would have revealed pollutant levels above multiple NALs for two consecutive reporting years, thus putting the Facility in ERA Level 2. *See* Storm Water Permit, Section XII(D).

136.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continues to fail to conduct a Level 1 status evaluation and submit a Level 1 ERA Report as required under Section XII(C) of the Storm Water Permit.

137.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed, and continue to fail, to submit adequate ERA Reports in recent reporting years to the Regional Board for the Facility.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)]**

138.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

139.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

140.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.

141.   Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Sections I(D) (Finding 32) and V(A); 33 U.S.C. § 1311(b).

142.   The Storm Water Permit's SWPPP requirements and Section V(A) of require dischargers to reduce or prevent pollutants in their storm water discharges

through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

143.   Each day since at least August 20, 2016, that Defendants have failed to develop and implement BAT and BCT is a separate and distinct violation of the Storm Water Permit.

144.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur at the Facility in violation of Storm Water Permit Section III(B) due to inadequate BMP development and/or implementation necessary to prevent such discharges.

145.   The Defendants violate, and will continue to violate, the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

146.   Plaintiff is informed and believes, and thereon alleges, that the Defendants' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

147.   Each day since at least August 20, 2016, that the Defendants discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

148.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

149.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

150.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act**
**[33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)]**

151.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

152.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

153.   Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of WQS has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

154.   Defendants' discharges of storm water that contains pollutants in concentrations that exceed levels authorized by the Storm Water Permit's Receiving Water Limitations is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Section VI; 33 U.S.C. § 1311(b).

155.   The Defendants violate, and will continue to violate, the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

156.   Plaintiff is informed and believes, and thereon alleges, that the Defendants' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

157.   Each and every violation of the Storm Water Permit's Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

158.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

159.   An action for injunctive relief under the CWA is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

160.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## THIRD CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)]**

161.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

162.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of Section X of the Storm Water Permit.

163.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continue to fail, to implement the SWPPP for the Facility, in violation of Section X of the Storm Water Permit.

164.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continue to fail, to adequately revise the SWPPP for the Facility, in violation of Section X of the Storm Water Permit.

165.   The Defendants have been in violation of the Storm Water Permit at the Facility every day from at least August 20, 2016, to the present.

166.   The Defendants' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

167.   The Defendants will continue to be in violation of the Storm Water Permit and the CWA each and every day the Defendants fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

168.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

169.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

170.   An action for injunctive relief under the CWA is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

171.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## **FOURTH CAUSE OF ACTION**

**Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

**[33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)]**

172.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

173.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continue to fail, to develop an adequate monitoring and reporting plan for the Facility, in violation of Section XI of the Storm Water Permit.

174.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continue to fail, to implement a monitoring and reporting plan for the Facility that complies with Section XI of the Storm Water Permit.

175.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continue to fail, to revise a monitoring and reporting plan for the Facility, in violation of Section XI of the Storm Water Permit.

176.   The Defendants have been in violation of the Storm Water Permit's monitoring and reporting requirements at the Facility every day from at least August 20, 2016, to the present.

177.   The Defendants' violations of their Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

178.   The Defendants will continue to be in violation of Section XI of the Storm Water Permit and the CWA, each and every day it fails to adequately develop, implement, and/or revise their monitoring and reporting plan for the Facility.

179.   Each and every violation of the Storm Water Permit's monitoring and reporting requirements at the Facility is a separate and distinct violation of the CWA.

180.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the

CWA occurring from August 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

181.   An action for injunctive relief under the CWA is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

182.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FIFTH CAUSE OF ACTION

**Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act**

**[33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)]**

183.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

184.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continue to fail, to sufficiently sample and analyze storm water in violation of Sections XI(B)(2) and (B)(6) of the Storm Water Permit.

185.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continue to fail, to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

186.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continue to fail, to submit adequate ERA Reports to the Regional Board, in violation of Section XII(C) of the Storm Water Permit.

187.   Plaintiff is informed and believes, and thereon alleges, that the Defendants' Annual Reports failed, and continue to fail, to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Sections XI and XVI of the Storm Water Permit.

188.   Plaintiff is informed and believes, and thereon alleges, that the Defendants have failed, and continues to fail, to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the Storm Water Permit.

189.   The Defendants have been in violation of Sections XI, XII, and XVI of the Storm Water Permit since at least August 20, 2016.

190.   The Defendants have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Sections XI, XII(C), and XVI of the Storm Water Permit.

191.   The Defendants have been in violation of Sections XI, XII(C) and XVI of the Storm Water Permit since at least August 20, 2016.

192.   The Defendants' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

186.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from August 20, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

193.   An action for injunctive relief under the CWA is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

194.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VII.    RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court Order declaring Defendants to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

b.    A Court Order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.    A Court Order assessing civil monetary penalties for each violation of the CWA at $55,800.00 per day per violation for all violations that occurred after November 2, 2015. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.    A Court Order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.    Any other relief as this Court may deem appropriate.

Dated: October 18, 2021                    CALIFORNIA COASTKEEPER

                                           By:    */s/Drevet Hunt*
                                                  Drevet Hunt
                                                  Attorney for Plaintiff
                                                  LOS ANGELES WATERKEEPER.